UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------X
                                            :

SECURITIES AND EXCHANGE      :
COMMISSION,                      :
                                            :

                          Plaintiff,   :        15 Civ. 1248 (KPF)
                                            :

                        v.           :       OPINION AND ORDER
                                          :

JOHN JANKOVIC,              :
                                            :

                           Defendant.  :
                                            :
-----------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: January 4, 2018

KATHERINE POLK FAILLA, District Judge:

      Plaintiff Securities and Exchange Commission (the "SEC") brought this civil enforcement action against Defendant John Jankovic ("Jankovic") and others, alleging violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b); Rule 10b-5 implemented thereunder, 17 C.F.R. § 240.10b-5; and Sections 17(a)(1), (2), and (3) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77q(a)(1)-(3). On August 8, 2016, the SEC moved for summary judgment on each alleged violation. On March 21, 2017, this Court granted the SEC's motion for summary judgment solely with respect to the claims under Sections 17(a)(2) and (3). *See SEC* v. *Jankovic*, No. 15 Civ. 1248 (KPF), 2017 WL 1067788 (S.D.N.Y. Mar. 21, 2017).

      The SEC now moves for post-judgment remedies and relief. Specifically, it requests that the Court order disgorgement in the amount of $450,000, plus prejudgment interest of $121,039; a civil monetary penalty; and permanent

injunctions prohibiting Jankovic from violating Sections 17(a)(2) and (3) of the Securities Act and from soliciting or accepting funds from any person or entity in an unregistered offering of securities. Jankovic opposes all facets of the SEC's motion, arguing that disgorgement should be limited to the amount of his personal profits, $57,000; that prejudgment interest is unwarranted; and that the Court should impose neither a civil penalty nor a permanent injunction against him. For the reasons set forth in the remainder of this Opinion, the SEC's requests for disgorgement, a civil monetary penalty, and a permanent injunction prohibiting violations of Sections 17(a)(2) and (3) of the Securities Act are granted. The SEC's request for a permanent injunction prohibiting Jankovic from raising funds in an unregistered offering of securities is denied.

**BACKGROUND**[1]

## A. Factual Background

The following sections discuss the underlying facts only to the extent necessary to resolve the instant motion, as the Court has previously engaged in a more exhaustive factual recitation. *See Jankovic*, 2017 WL 1067788, at *2-6.

### 1. Jankovic's Role at Premiere Power

Jankovic was an initial member — along with his father, Jerry Jankovic, and an Oklahoma-based attorney, Thomas Gudgel ("Gudgel") — of Premiere

---

[1]     For ease of reference, the Court refers to the SEC's memorandum of law in support of its motion for post-judgment relief as "SEC Br." (Dkt. #74); to Jankovic's opposition memorandum as "Def. Opp." (Dkt. #76); and to the SEC's reply memorandum as "SEC Reply" (Dkt. #77).

Power, LLC ("Premiere"). *Jankovic*, 2017 WL 1067788, at *2. Sandra Dyche ("Dyche"), with whom Jerry Jankovic had previously founded another company (21st Century Morongo Energy LLC ("Morongo")), became a member of Premiere's Board of Directors. *Id.* at *1, 3. Premiere's ostensible mission was to develop and operate power plants on Native American tribal land, though the company never developed, built, or operated any such plants nor generated any revenues. *Id.* at *2, 6.

Jankovic worked at Premiere from July 2009 until January 1, 2012. *Jankovic*, 2017 WL 1067788, at *3, 6. Starting in early December 2009, Jankovic assumed the role of Premiere's Chief Executive Officer ("CEO"), *id.* at *3, a position he kept until his "active role" in the company "ceased in summer of 2011," *id.* at *6. Between December 2009 and March 2010, Jankovic helped Premiere raise nearly $2 million in interim financing from three sets of investors: Moon Joo Yu ("Yu"), who invested $1.5 million; Hee Rak Kim, who invested $150,000; and Hyun Ja Kim and Jae Duk Kim, who invested $300,000. *Id.* at *3, 6. Yu made her investments in three equal tranches: On December 9, 2009, she gave Dyche $500,000 in cash; on December 14 and 15, 2009, she wired a total of $500,000 to Premiere's bank account in two separate installments; and sometime after December 15, 2009, she gave Dyche another $500,000. *Id.* at *3. Yu was told that, in exchange for her $1.5 million investment, she would receive a 0.60% stake in the company. *Id.* Jae Duk Kim invested $300,000 on December 23, 2009, for a 0.12% interest in the

company.  *Id.* at *6.  And in March 2010, Hee Rak Kim invested $150,000 in exchange for a 0.06% stake in the company.  *Id.*

### 2. Misstatements and Omissions Regarding Proceeds from Investors

Not all of the funds that Yu invested actually went to Premiere.  *Jankovic*, 2017 WL 1067788, at *3.  Instead, $1 million of Yu's investment was used to pay for "legal fees" incurred in a 2006 lawsuit arising out of events at Morongo. *Id.*  Like Premiere, Morongo was an energy company with the stated goal of developing a power plant on Native American land.  *Id.* at *2.  In the Morongo litigation, two individuals — Byung Chul An and Hyang Ok An (collectively, the "Ans") — who had invested a combined $1.2 million in Morongo, sued Jerry Jankovic, Dyche, and others for fraud, negligent misrepresentation, and conversion.  *Id.*

Sometime in 2009, Jankovic learned from his father that Morongo had been sued by its investors and that his father was a named defendant in that action.  *Jankovic*, 2017 WL 1067788, at *2.  On September 15, 2009, Jankovic sent an email to his father and Gudgel; it attached a letter addressed to the Ans asking them to "drop any and all legal actions against [Morongo], Jerry Jankovic, [and Dyche]" in exchange for "a 2% ownership interest in Premiere." *Id.* at *3.  By December 2009, Jankovic understood that Dyche planned to give part of Yu's investment in Premiere to the Ans in order to resolve the Morongo litigation.  *Id.*  And on December 10, 2009, Jankovic sent Gudgel and Dyche an email, copying his father, that stated: "Sandra, your proposed buy-out of the

4

An interest will serve the same purpose as the An settlement." *Id.* (internal quotation marks omitted).

Jankovic was well aware of the gap between the ownership share that Yu was entitled to, per a Subscription Agreement she had signed on December 9, 2009, and the money that was actually received by Premiere from Yu's investment. *Jankovic*, 2017 WL 1067788, at *12. Yu's Subscription Agreement, which Jankovic received on December 13, 2009, indicated that she was receiving a 0.60% stake in Premiere in exchange for $1.5 million. *Id.* at *3. But Yu had wired just $500,000 into Premiere's bank account; she gave the remaining $1 million directly to Dyche. *Id.* Jankovic spoke with Gudgel about the gap between the $500,000 that Premiere had received and the $1.5 million represented on Yu's Subscription Agreement. *Id.* at *4. Together, they then spoke with Dyche. *Id.* In Jankovic's telling of events, he encouraged Dyche to update the Subscription Agreement to reflect that Yu had only invested $500,000, as well as to speak with Yu to "make sure that [Yu] understood what [she] was buying." *Id.* (internal quotation marks omitted). Dyche did neither. *Id.*

Jankovic himself did nothing to correct the problem, though not for lack of opportunity. On December 22, 2009, Premiere hosted a meeting for current and prospective investors in the offices of a prominent New York law firm (the "Investors Meeting"). *Jankovic*, 2017 WL 1067788, at *5. Jankovic, Dyche, Gudgel, and others from Premiere attended the meeting, as did Yu, Hee Rak Kim, Jae Duk Kim, and other potential investors. *Id.* Jankovic took the lead in

addressing investors at the meeting.  *Id.*  Yet Jankovic never spoke with Yu at the meeting (or anytime thereafter) about the disparity between the money she had invested and the money Premiere had actually received, or, more generally, about the Morongo litigation and the use of her investment in Premiere to resolve that litigation.  *Id.* at *4.

To the contrary, Jankovic made affirmative misstatements to Yu that perpetuated the discrepancy between Yu's Subscription Agreement and Yu's actual investment in Premiere.  *Jankovic*, 2017 WL 1067788, at *4.  In January 2010, Jankovic signed a Certificate of Ownership indicating that Yu held a 0.60% interest in Premiere, even though only $500,000 of her investment had actually gone to Premiere.  *Id.*  And on February 10, 2010, Jankovic wrote a letter to Yu in which he referred to her "0.60% membership in Premiere."  *Id.* He did so despite being aware that at least $500,000 of Yu's investment had not been invested in Premiere and instead had been used to cover costs related to the Morongo litigation.  *Id.*

### 3.    Other Misstatements and Omissions in Key Communications with Premiere Investors

Jankovic's missteps extended well beyond failing to inform Yu of the gap between her $1.5 million investment and the $500,000 Premiere actually received and issuing a Certificate of Ownership that perpetuated that error.  On various occasions, Jankovic communicated with investors and potential investors and made material misstatements and omissions that sustained Premiere's fraudulent scheme.  To begin with, Jankovic was one of the authors of the Preliminary Information Memorandum (the "PIM") that Premiere

6

distributed to potential investors, including Yu, Hee Rak Kim, and Jae Duk Kim. *Jankovic*, 2017 WL 1067788, at *6. The PIM contained multiple "lies" that "lent to Premiere an imprimatur of legitimacy." *Id.* at *11. Premiere's leadership, including Jankovic, made these misstatements even though they warranted that they "ha[d] taken reasonable care to ensure that the information" in the PIM was "true and accurate in all material respects." *Id.* at *5 (internal quotation marks omitted). The PIM's material misstatements included the following:

> i) The PIM listed a former Oklahoma Congressman as a member of Premiere's Board of Directors and claimed that this Congressman held a 1% equity interest in Premiere. That Congressman never agreed to serve on Premiere's Board.
>
> ii) The PIM identified the Managing Executive Director of an energy company as a member of Premiere's Board of Directors. Like the Congressman, the Managing Director was purported to hold a 1% stake in Premiere. The Managing Director had discussed the possibility of joining Premiere, but had never committed to serving as a member of Premiere's Board.
>
> iii) The PIM stated that an Oklahoma accounting firm would handle Premiere's outsourced accounting and bookkeeping. That firm, however, never agreed to work with Premiere.
>
> iv) Finally, the PIM identified a nationally known accounting firm as an "Affiliate" of Premiere's "Corporate Holdings" division. But the National Accounting Firm never had a relationship of any sort with Premiere.

*Id.*

In addition, on December 22, 2009, Jankovic repeated many, if not all, of these misstatements at the Investors Meeting, where he delivered a PowerPoint

presentation that mirrored the PIM's content.  *Jankovic*, 2017 WL 1067788,

at *5.  At the meeting, Jankovic distributed copies of the flawed PIM to some of

the investors.  *Id.*  He spoke to the assembled investors for approximately one

hour, with Dyche translating his remarks into Korean.  *Id.* at *6.  During the

presentation, he did not mention the Morongo litigation, nor any intention to

use any of the investors' funds to cover fees stemming from that litigation.  *Id.*

at *4.

**B.      Procedural Background**

On February 20, 2015, the SEC initiated a civil enforcement action by

filing its Complaint against Jankovic, Jerry Jankovic, and Premiere.  (Dkt. #1).

Because neither Jerry Jankovic nor Premiere appeared in this matter, on

October 9, 2015, the Court entered default judgments against both.  (Dkt. #35,

36).  On July 27, 2016, the SEC filed a motion for summary judgment against

Jankovic.  (Dkt. #45).  On March 21, 2017, the Court found, as a matter of law,

that Jankovic had violated Sections 17(a)(2) and (3) of the Securities Act.  (Dkt.

#62).  On June 23, 2017, the SEC filed the instant motion for post-judgment

remedies and relief.  (Dkt. #73).  On July 21, 2017, Jankovic filed a

memorandum of law in opposition to the SEC's motion for post-judgment

remedies and relief.  (Dkt. #76).  On August 4, 2017, the SEC filed a reply brief.

(Dkt. #77).

**DISCUSSION**

**A.      Applicable Law**

**1.      Disgorgement**

The SEC seeks several post-judgment remedies, each of which is discussed in turn, beginning with the request for disgorgement. The Court has broad discretion in determining whether to order the disgorgement of ill-gotten gains and, if so, in what amount. *See SEC* v. *Fischbach Corp.*, 133 F.3d 170, 175 (2d Cir. 1997); *SEC* v. *First Jersey Sec., Inc.*, 101 F.3d 1450, 1474-75 (2d Cir. 1996). The primary purpose of disgorgement is not punitive; instead, it is to deprive wrongdoers of any unjust enrichment and to deter similar conduct. *See Official Comm. of Unsecured Creditors of WorldCom, Inc.* v. *SEC*, 467 F.3d 73, 82 (2d Cir. 2006); *SEC* v. *Tome*, 833 F.2d 1086, 1096 (2d Cir. 1987); *SEC* v. *Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1104 (2d Cir. 1972).

To determine the amount of disgorgement, a court focuses on the extent to which an individual — or a group of individuals — has profited from the fraud. *See First Jersey Sec., Inc.*, 101 F.3d at 1474. The assessment need not be made with absolute precision: As the Second Circuit has explained, the amount of "[d]isgorgement need only be a reasonable approximation of profits causally connected to the violation." *SEC* v. *Patel*, 61 F.3d 137, 139 (2d Cir. 1995) (quoting *SEC* v. *First City Fin. Corp.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989). Any "risk of uncertainty ... fall[s] on the wrongdoer whose illegal conduct created that uncertainty." *SEC* v. *Lorin*, 76 F.3d 458, 462 (2d Cir. 1996) (quoting *Patel*, 61 F.3d at 140).

9

Once the SEC has demonstrated an approximate amount of ill-gotten gains, the burden shifts to the defendant to "demonstrat[e] that he received less than the full amount allegedly misappropriated and sought to be disgorged." *SEC* v. *Benson*, 657 F. Supp. 1122, 1133 (S.D.N.Y. 1987); *see also SEC* v. *Opulentica, LLC*, 479 F. Supp. 2d 319, 330 (S.D.N.Y. 2007). Where individuals have collaborated, conspired, or otherwise worked together to violate the securities laws, they may be held jointly and severally liable for any amount to be disgorged. *See, e.g., First Jersey Sec., Inc.*, 101 F.3d at 1475 ("[W]here a firm has received gains through its unlawful conduct, where its owner and chief executive officer has collaborated in that conduct and has profited from the violations, and where the trial court has, within the proper bounds of discretion, determined that an order of disgorgement of those gains is appropriate, it is within the discretion of the court to determine that the owner-officer too should be subject, on a joint and several basis, to the disgorgement order."); *SEC* v. *Stone*, No. 06 Civ. 6258 (HB), 2009 WL 82661, at *6 (S.D.N.Y. Jan. 13, 2009) ("Where two or more individuals or entities collaborated in the violations of the securities laws, the court has discretion to hold them jointly and severally liable for the disgorgement of illegally obtained proceeds.").

A court also has discretion to award prejudgment interest on the amount of disgorgement and to determine the rate at which such interest shall be calculated. Prejudgment interest, like the disgorgement itself, "is meant to deprive wrongdoers of the fruits of their ill-gotten gains from violating securities

laws." *SEC* v. *Lorin*, 877 F. Supp. 192, 201 (S.D.N.Y. 1995), *aff'd in part and vacated in part on other grounds*, 76 F.3d 458 (2d Cir. 1996). "Requiring payment of interest prevents a defendant from obtaining the benefit of what amounts to an interest free loan procured as a result of illegal activity." *SEC* v. *Svoboda*, 409 F. Supp. 2d 331, 345 (S.D.N.Y. 2006) (internal quotation marks and citation omitted).

### 2. Civil Monetary Penalties

Additionally, Section 20(d)(1) of the Securities Act authorizes the SEC to seek a civil penalty against any violator. 15 U.S.C. § 77t(d). There are three tiers of civil penalties. The first tier provides for a penalty, for each violation committed by a natural person between March 3, 2009, and March 5, 2013, of the greater of $7,500 or the gross amount of pecuniary gain. 15 U.S.C. § 77t(d)(2)(A); 17 C.F.R. § 201.1004. The second tier, which applies where the conduct at issue "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement," is similar to the first except that it allows for a penalty of $75,000 per violation. 15 U.S.C. § 77t(d)(2)(B); 17 C.F.R. § 201.1004. Finally, the third tier, which applies where the defendant's conduct "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons," allows for a penalty of $150,000 per violation. 15 U.S.C. § 77t(d)(2)(C); 17 C.F.R. § 201.1004.

Civil penalties are punitive in nature: Their purpose is "to create meaningful financial disincentives to participating in fraudulent conduct." *SEC* v. *Jadidian*, No. 08 Civ. 8079 (PGG); 2011 WL 1327245, at *8 (S.D.N.Y.

Mar. 31, 2011).  As the House Report on the Remedies Act notes, civil penalties are "necessary for the deterrence of securities law violations that otherwise may provide great financial returns to the violator."  H.R. Rep. No. 101-616, at 1384 (1990).  In determining whether to impose civil penalties, courts may consider:

> [i] the egregiousness of the defendant's conduct, [ii] the degree of the defendant's scienter, [iii] whether the conduct created substantial losses or the risk of substantial losses to other persons, [iv] whether the conduct was isolated or recurrent, and [v] whether the penalty should be reduced in light of the defendant's demonstrated current and future financial condition.

*Jadidian*, 2011 WL 1327245, at *8.

### 3.    Permanent Injunctions

Finally, there is the remedy of injunctive relief.  Courts may, in their discretion, award permanent injunctive relief when "the defendant's past conduct indicates … that there is a reasonable likelihood of further violation in the future."  *SEC* v. *Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 99 (2d Cir. 1979) (internal quotation marks and citation omitted); *see also SEC* v. *Monarch Fund*, 608 F.2d 938, 943 (2d Cir. 1979).  The Second Circuit has established that, in weighing whether to issue a permanent injunction, a court should consider "the fact that defendant has been found liable for illegal conduct; whether the infraction is an 'isolated occurrence'; whether defendant continues to maintain that his past conduct was blameless; and whether, because of his professional occupation, the defendant might be in a position where future violations could be anticipated."  *Commonwealth Chem. Sec., Inc.*, 574 F.2d at 100.  Courts may also consider "the degree of scienter involved."  *SEC* v.

*Cavanaugh*, 155 F.3d 129, 135 (2d Cir. 1998) (internal quotation marks and citation omitted).

## B.    Analysis

### 1.    Disgorgement in the Amount of $450,000 and Prejudgment Interest in the Amount of $121,039 Are Warranted

The SEC requests disgorgement of the proceeds in the amount of $450,000. It does not seek the total proceeds received from investors in this fraudulent scheme — $1.95 million — in light of a recent Supreme Court decision making clear that SEC claims for disgorgement are subject to the five-year limitations period set forth in 28 U.S.C. § 2462. *See Kokesh* v. *SEC*, 137 S. Ct. 1635 (2017). In this case, the only investments that were conclusively shown to have been made within the five-year limitations period — between December 20, 2009, and December 20, 2014 — are those from Jae Duk Kim and Hee Rak Kim. Yu made her initial investment of $500,000 on December 9, 2009; her second investment of $500,000 on December 14 and 15, 2009; and her third investment of $500,000 "[s]ometime after December 15, 2009," though the Court cannot, on the record before it, determine with certainty when that investment was made. *Jankovic*, 2017 WL 1067788, at *3. Accordingly, the SEC does not seek disgorgement of any of Yu's investments. It only seeks disgorgement of the $300,000 investment that Jae Duk Kim made on December 23, 2009, and the $150,000 investment that Hee Rak Kim made in March 2010. It argues that Jankovic should be jointly and severally liable with Premiere and Jerry Jankovic, whom the Court has already ordered to disgorge $950,000 in connection with this fraudulent

13

scheme. (Dkt. #35, 36).

Jankovic claims that disgorgement in the amount of $450,000 would be "improper and excessive." (Def. Opp. 3). He notes that the total amount that he personally received within the five-year statute of limitations period is $57,000. (*Id.* at 3-4). He further submits that he "was not the primary bad actor and was not responsible for raising all of the funds for Premiere from investors," and that "his conduct pales in comparison to that of his father Jerry Jankovic and Sandra Dyche." (*Id.* at 4). Jankovic further claims that he "did not control Premiere" and, for this reason, it would be unfair to order disgorgement of any amount beyond his personal profits ($57,000). (*Id.* at 4).

The Court rejects entirely Jankovic's arguments. It has already found that Jankovic was culpable; that he was one of the principal authors of the PIM; that he served as Premiere's CEO during the relevant time period; that he was a principal speaker at the Investors Meeting; and that he was a primary actor in the fraudulent scheme to misappropriate investors' funds. *Jankovic*, 2017 WL 1067788, at *6, 11-12. The Court further notes that, under controlling precedent, it may disgorge not just the amount of personal profits but rather "the full amount of the 'proceeds' received from investors." *SEC v. Tourre*, 4 F. Supp. 3d 579, 590 (S.D.N.Y. 2014) (citing *Manor Nursing Ctrs.*, 458 F.2d at 1103-04); *see also SEC* v. *Murray*, No. 05 Civ. 4643 (MKB), 2013 WL 839840, at *2 (E.D.N.Y. Mar. 6, 2013) ("[W]here, as here, a defendant uses an entity as the vehicle for his or her fraud, the court may use that entity's profits as a measure of the appropriate disgorgement."). Because Jankovic

failed to notify Yu that her funds were being misappropriated, and because he failed to conduct even basic diligence to confirm the accuracy of information in the PIM and Certificate of Ownership, the Court finds no reason to limit disgorgement to Jankovic's personal profits. Instead, it holds Jankovic jointly and severally liable with Premiere and Jerry Jankovic for the $450,000 in proceeds received within the limitations period.

For the same reasons, the Court grants the SEC's request for prejudgment interest in the amount of $121,039, which figure was calculated using the rate employed by the Internal Revenue Service (the "IRS") for underpayment of taxes. Jankovic, along with Premiere and Jerry Jankovic, engaged in a scheme to defraud the public. Jankovic did in fact defraud three investors who lost $1.95 million. At a minimum, Jankovic was negligent in allowing the fraud to take place. Jankovic, Jerry Jankovic, and Premiere should not be allowed to benefit from the time value of money on their unlawful gains. Therefore, prejudgment interest that deprives Jankovic of the time value of those gains is warranted.

### 2. A Civil Monetary Penalty in the Amount of $57,000 Is Appropriate

The SEC also requests that the Court impose a first-tier civil monetary penalty against Jankovic. (SEC Br. 7-11). First-tier penalties are the lowest level under Securities Act Section 20(d), and, unlike second- and third-tier penalties, do not require a showing of "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." *Compare* 15 U.S.C. § 77t(d)(2)(A), *with* 15 U.S.C. § 77t(d)(2)(B)-(C). The purpose of these

penalties is to create financial disincentives to participating in fraudulent schemes like the one Jankovic, Jerry Jankovic, and Premiere engaged in here. The size of the penalty is to be "determined by the court in light of the facts and circumstances." 15 U.S.C. § 77t(d)(2)(A). As noted, in determining the appropriate civil penalty, the Court considers:

> [i] the egregiousness of the defendant's conduct; [ii] the degree of the defendant's scienter; [iii] whether the conduct created substantial losses or the risk of substantial losses to other persons; [iv] whether the conduct was isolated or recurrent; and [v] whether the penalty should be reduced in light of the defendant's demonstrated current and future financial condition.

*Jadidian*, 2011 WL 1327245, at *8.

The facts and circumstances of this case, weighed against the relevant factors, compel this Court to grant the SEC's request for a first-tier penalty in the amount of $57,000, equivalent to the total proceeds that Jankovic personally obtained within the limitations period. This Court's prior ruling that Jankovic violated Sections 17(a)(2) and (3) of the Securities Act establishes the predicate for civil monetary penalties. *See, e.g.*, *SEC* v. *Todt*, 7 F. App'x 98, 99 (2d Cir. 2001) (summary order) (affirming civil monetary penalties for violations of Section 17(a)). More to the point, the Court's earlier findings show that Jankovic's conduct was egregious. To begin, the "lies" in the PIM, a document that Jankovic authored, "were legion" and "not [mere] puffery." *Jankovic*, 2017 WL 1067788, at *11. They made Premiere appear legitimate, which it was not. *Id.* In addition, although Jankovic "knew that only one-third of the $1,500,000 Yu believed she invested in Premiere was actually invested in the company," he

16

"fail[ed] to explain this to Yu, or ensure that Dyche did." *Id.* at \*16. And after learning that nobody else at Premiere had told Yu that most of her investment was not being used for their stated purpose, Jankovic "did nothing to pursue this issue further." *Id.* Finally, Jankovic then executed a Certificate of Ownership that confirmed Yu's 0.60% interest in Premiere, which conduct only reinforced the earlier misstatements made by Jankovic and others.

The Court's decision to impose a civil monetary penalty is further justified because (i) Jankovic's negligence contributed to substantial losses to Yu, Jae Duk Kim, and Hee Rak Kim, who collectively invested $1.95 million based at least in part on Jankovic's misconduct, and (ii) his misconduct extended over a period of many months. Jankovic's misconduct included misrepresentations in the PIM and at the Investors Meeting on December 22, 2009, and continued until at least March 2010, when Hee Rak Kim invested $150,000 based in part on representations made by Jankovic. Finally, although Jankovic claims that his "poor financial condition should mitigate any civil penalty imposed on him" (Def. Opp. 8), he fails to offer documentary evidence of any financial constraints, fails to consider future earning capability, and relies exclusively on his own declaration filed in opposition to the SEC's motion (*see* Dkt. #76-1, at ¶¶ 2-3). As sister courts in this District have held, "claims of financial hardship — presented only in affidavits from defendants themselves, and not considering future earning capability — are insufficient to outweigh the appropriateness of a penalty." *SEC* v. *Forest Res. Mgmt. Corp.*, No. 09 Civ. 903 (JSR), 2010 WL 2077202, at \*2 (S.D.N.Y. May 18, 2010).

### 3. The Court Permanently Enjoins Jankovic from Violating Sections 17(a)(2) and (3) of the Securities Act

Congress authorized courts to issue injunctive relief "to proscribe future violations of federal securities laws." *SEC* v. *Cavanagh*, 155 F.3d 129, 135 (2d Cir. 1998). To determine whether to issue an injunction, courts assess the likelihood of future violations, including by weighing the following factors:

> the fact that defendant has been found liable for illegal conduct; the degree of scienter involved; whether the infraction is an isolated occurrence; whether defendant continues to maintain that his past conduct was blameless; and whether, because of his professional occupation, the defendant might be in a position where future violations could be anticipated.

*Commonwealth Chem. Sec., Inc.*, 574 F.2d at 100 (internal quotation marks omitted). Scienter is not required for negligence-based claims, like those brought under Sections 17(a)(2) and (3) of the Securities Act. *First Jersey Sec., Inc.*, 101 F.3d at 1467.

In the previous section, the Court addressed most of these factors. It noted that this Court has previously held Jankovic liable for violating Sections 17(a)(2) and (3) of the Securities Act. It further held that the infraction was not an isolated incident, but rather spanned from at least December 2009 until March 2010, and included numerous oral and written "lies" that "lent to Premiere an imprimatur of legitimacy [and] … made Premiere appear legitimate when, in fact, it was not." *Jankovic*, 2017 WL 1067788, at *11. And the Court found that Jankovic's negligence was egregious, even if the Court could not find as a matter of law that Jankovic had acted with scienter.

The only factors that the Court has yet to assess are whether Jankovic continues to maintain that his past conduct was blameless, and whether Jankovic, because of his occupation, might be in a position to violate again in the future. Both militate in favor of an injunction. Though Jankovic does not maintain that his conduct was entirely blameless, he continues to minimize his role in the fraudulent scheme and makes only perfunctory statements regarding his own culpability. The Court has already held that Jankovic failed "to disclose to Yu the information he knew about Dyche's plan for Yu's investment," and that he "also made affirmative misstatements to Yu … [that] erroneously assured Yu that Premiere had upheld its end of a $1,500,000 bargain." *Jankovic*, 2017 WL 1067788, at *13. Yet Jankovic focuses almost exclusively on others' conduct, noting that his "culpability pales in comparison to his father and Dyche," and that he "was not the primary bad actor and was not responsible for raising all of the funds for Premiere from investors." (Def. Opp. 1, 4). Similarly, although the Court has already found that "[t]here are many reasons to doubt [Jankovic's] reliance defenses," *Jankovic*, 2017 WL 1067788, at *13, Jankovic reasserts them with undiminished vigor, asserting that, "[t]hroughout the entirety of his activities at Premiere John Jankovic relied on his father Jerry Jankovic (who was Premiere's Chairman) for information and guidance" (Def. Opp. 2). He insists that his conduct "was an isolated occurrence and does not amount to a pervasive pattern … because they were based on falsehoods perpetrated by other officers of Premier[e]." (*Id.* at 7).

Jankovic's submissions do little to assuage the Court's concerns regarding the likelihood of future violations. To be sure, defendants are "'not to be punished because they vigorously contest the government's accusations'" and are not required "'to behave like Uriah Heep in order to avoid injunctions.'" *SEC* v. *Johnson*, No. 03 Civ. 177 (JFK), 2006 WL 2053379, at *6 (S.D.N.Y July 24, 2006) (quoting *SEC* v. *First City Fin. Corp.*, 890 F.2d 1215, 1229 (D.C. Cir. 1989)). Yet Jankovic's statements, particularly those made *after* the Court explicitly faulted him for making numerous misstatements and omissions that led Yu, Jae Duk Kim, and Hee Rak Kim to lose nearly $2 million, suggest that he has not absorbed the seriousness of his misconduct or the gravity of the harm caused. Jankovic continues to downplay his own negligence and shift blame onto others, and he does not evince the slightest concern for the investors that he, Jerry Jankovic, and Premiere defrauded. Accordingly, this factor weighs in favor of an injunction.

In addition, the Court finds that, because of his occupation, Jankovic would be in a position to violate again in the future. As the SEC rightly notes, Jankovic "has an MBA from the University of Michigan"; "[holds] himself out as having nearly 20 [years] of finance, project and strategy leadership experience"; "is in his early forties and has decades remaining in his career"; and "has a track record of starting companies, including a consulting company that compiled information for the Premiere Power PIM, and an oil and gas startup, as well as Premiere Power itself." (SEC Br. 12 (internal quotation marks omitted)). In light of these facts, the Court finds that it is likely that Jankovic

again would find himself in a position where he could violate Sections 17(a)(2) and (3) of the Securities Act.

Jankovic seeks to convince the Court that his negligence "was merely an isolated occurrence" and "was a result of [his] failure ... to verify the statements made to him by officers at Premier[e]." (Def. Opp. 10). He suggests that, because he is now estranged from his father, there is little chance that he will engage in similar misconduct in the future. (*Id.* at 2, 8). But even if the Court were to accept Jankovic's reliance defenses — about which the Court has already expressed grave concerns — it would still be unconvinced that Jankovic is unlikely to reoffend. For months after learning that at least $500,000 of Yu's investment had been misappropriated, and even after he learned that Dyche had not alerted Yu to the same, Jankovic still failed to reach out to Yu or verify the veracity of statements contained in the PIM. To the contrary, Jankovic issued a Certificate of Ownership that perpetuated the fraudulent scheme. His misconduct was hardly an isolated occurrence, and this Court is unconvinced that his misconduct stemmed entirely from the trust he placed in others at Premiere.

### 4. An Injunction Prohibiting Jankovic from Soliciting or Accepting Funds in an Unregistered Securities Offering Is Unwarranted

The last remedy that the SEC seeks is a permanent injunction against Jankovic from directly or indirectly soliciting or accepting funds from any person or entity in an unregistered offering of securities. The SEC argues that the injunction "is narrowly tailored to prevent precisely the kind of conduct by

Jankovic that harmed investors in this case." (SEC Br. 13). The Court disagrees.

Jankovic was found liable for negligence-based violations of Sections 17(a)(2) and (3) — no more, no less. The Court's injunction against Jankovic prohibiting violations of Sections 17(a)(2) and (3) of the Securities Act is narrowly tailored to the conduct that harmed investors in this case. The SEC's request for a permanent injunction prohibiting Jankovic from raising funds would go much further. It would enjoin not just negligence-based conduct, but also conduct that is devoid of any wrongdoing. It is worth remembering here that the Court declined to find as a matter of law that Jankovic acted with scienter or reckless disregard for the truth, even if the issue "present[ed] a very close question." *Jankovic*, 2017 WL 1067788, at *13. An injunction against soliciting funds might well be appropriate in a case where the defendant is found to have acted intentionally or with reckless disregard for the truth. Such culpable conduct calls for a broad injunction. But it is inappropriate here, where Jankovic has only been found to have acted negligently.

In an effort to persuade the Court to issue a conduct-based injunction against Jankovic, the SEC notes that the Court has already issued the same injunction against Jankovic's father Jerry. Yet the SEC was awarded a default judgment against Jankovic's father on all claims, including the scienter-based claims. The same cannot be said for the SEC's scienter-based claims against Jankovic. And the SEC has cited no cases or other authority that convinces

22

the Court that a violation of Sections 17(a)(2) and (3) warrants such a broad injunction, particularly where the Court has issued a more narrow injunction specifically prohibiting future violations of Sections 17(a)(2) and (3). Accordingly, the Court declines to issue a permanent injunction prohibiting Jankovic from directly or indirectly soliciting or accepting funds from any person or entity in an unregistered offering of securities.

## CONCLUSION

For the reasons cited above, the SEC's requests for disgorgement in the amount of $450,000, prejudgment interest in the amount of $121,039, a civil money penalty in the amount of $57,000, and a permanent injunction prohibiting Jankovic from violating Sections 17(a)(2) and (3) of the Securities Act are GRANTED. The SEC's request for an injunction against Jankovic from soliciting or accepting funds from any person or entity in an unregistered offering of securities is DENIED.

The Court understands that this Order may affect the parties' views on the need to adjudicate the remaining claims in this case. For this reason, the Court hereby ADJOURNS *sine die* the jury trial previously scheduled to start on February 20, 2018. The parties are ORDERED to file a joint letter on or before **February 9, 2018**, advising the Court whether they still intend to proceed to trial and suggesting a revised trial schedule as necessary.

SO ORDERED.

Dated:  January 4, 2018
        New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge